IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

CRYSTAL LAMAY o/b/o K.P.,

                              Plaintiff,

              vs.                              Civil Action No.
                                               5:05-CV-0845 (GLS/DEP)

MICHAEL K. ASTRUE, Commissioner
of Social Security,[1]

                              Defendant.

_____

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

OLINSKY & SHURTLIFF, LLP        JAYA A. SHURTLIFF, ESQ.
P.O. Box 2068
186 West First Street
Oswego, NY 13126

FOR DEFENDANT:

HON. GLENN T. SUDDABY          WILLIAM H. PEASE, ESQ.
United States Attorney for the  Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, NY 13261-7198

_____

         [1]    Plaintiff's complaint, which was filed on May 24, 2005, named Jo Anne B.
Barnhart, the former Commissioner of Social Security, as the defendant.  On February
12, 2007, Michael J. Astrue took office as Social Security Commissioner.  He has
therefore been substituted as the named defendant in this matter pursuant to Rule
25(d)(1) of the Federal Rules of Civil Procedure, and no further action is required in
order to effectuate this change.  *See* 42 U.S.C. § 405(g).

OFFICE OF GENERAL COUNSEL    BARBARA L. SPIVAK, ESQ.
Social Security Administration    Chief Counsel, Region II
26 Federal Plaza
New York, NY 10278    ELLEN E. SOVERN, ESQ.
    Assistant Regional Counsel


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

This action is brought by plaintiff Crystal Lamay on behalf of her minor son, K.P., seeking judicial review of an administrative determination denying her son's application for children's supplemental security income ("SSI") benefits under the Social Security Act (the "Act"). In support of her challenge plaintiff contends, *inter alia*, that K.P. suffers from attention deficit hyperactivity disorder ("ADHD"), a learning disorder affecting the areas of reading and written expression; speech delay; delayed fine and gross motor skills; severe headaches; and asthma, and that this combination of conditions renders him disabled within the meaning of the Act. Plaintiff therefore contests a contrary conclusion by the administrative law judge ("ALJ") assigned by the agency to hear and decide the matter, and additionally argues that his failure to develop the report fully, particularly in view of her lack of legal representation, undermines the resulting determination.

2

Based on a thorough and careful review of the record in this case, considered in light of the plaintiff's arguments, I find that the Commissioner's determination was based upon the application of proper legal principles, and is supported by substantial evidence.

I.    BACKGROUND

K.P., born on August 18, 1997, was five years of age when his mother applied for social security benefits on his behalf, and seven at the time of the administrative hearing in this matter.  Administrative Transcript at 54, 71, 284.[2]  K.P., who was enrolled in the second grade at the time of the hearing, resides with his mother, Ms. Lamay; his mother's fiancé, Robert; a five-year-old younger brother; his three-year-old half-sister; and two female cousins, ages fourteen and eleven.   AT 157, 180, 248, 297. K.P.'s natural father, James, has relocated out of the area, and has since had only limited contact with the children.  AT 157, 248.  K.P. maintains a close relationship with his maternal grandfather who, together with his grandmother, spends six months out of each year in the Oswego, NY area, the remaining six months in Florida.  AT 158.

---

[2]      Portions of the administrative transcript, which was filed by the Commissioner on November 18, 2005, Dkt. No. 6, and a supplemental administrative transcript, filed on August 16, 2006, Dkt. No. 13, will be cited hereinafter as "AT ___."

A.    <u>School Records</u>

On October 2, 2001 employees of the Oswego City School District, where K.P. attended school at the time, performed a preschool evaluation in light of their concerns regarding his speech intelligibility.  AT 156A; *see* AT 156-65.  As a result of her testing and evaluation, school psychologist Nancy Tomlinson concluded that K.P. was a social child with below average cognitive abilities, poor impulse control, and a strong desire to control his environment.  AT 161.  Tomlinson also found that K.P. demonstrated delays in the areas of communication, daily living skills, socialization, gross motor skills, and age appropriate fine motor skills.  AT 161.  Based apparently on that evaluation, K.P. was determined to be a preschooler with a disability, and accordingly received speech therapy to address articulation and language concerns.  AT 207.

The alleged disability onset date of January 6, 2003 corresponds with the approximate midpoint of K.P.'s kindergarten year.  During his kindergarten year, which extended from the fall of 2002 until June, 2003, K.P. attended school in three different school districts.[3]  AT 207.  While

---

[3]     K.P. began kindergarten in the Mexico Central Schools (New Haven Elementary); transferred to Canisteo Central School District for approximately two marking periods; completed kindergarten and first grade in the Oswego City School District (Fitzhugh Park Elementary); and returned to Mexico Academy and Central School to attend second grade.  AT 249.

4

enrolled in kindergarten the Canisteo Central School District, K.P. received special education instruction in academics in a regular classroom setting, speech-language therapy, occupational therapy, and counseling to help improve anger management and social skills.  AT 103, 120, 146-47, 166-67.  K.P.'s teachers, classroom teacher Barbara Graham and special education teacher Cynthia Marera, noted that he needed an adult to supply reinforcement of new ideas and materials; that he failed to follow directions, complete work, and stay on task; and that he was very easily frustrated with work and social interactions.  AT 95-98.  Those teachers found the need to implement behavioral modification strategies for K.P. in the form of positive verbal and tangible reinforcement, "time outs," and adult-focused one-on-one attention.  AT 98.  They also noted that K.P. had difficulty paying attention, refused to join groups and language development activities, displayed very weak fine motor skills, and broke tools.  AT 118.

A follow-up evaluation was conducted on January 13, 2003 by Linda McLaughlin, an occupational therapist at the Canisteo Elementary School.  *See* AT 166-67.  Based on her findings, Ms. McLaughlin recommended that K.P. receive occupational therapy two times per week to address his fine and visual motor skills.  *Id.*

5

On or about October 26, 2003, during K.P.'s first-grade year, school psychologist Rebecca James performed a psychological evaluation to determine his needs and continued eligibility for special educational services. *See* AT 206-09. In her report, Ms. James noted that K.P. was doing well academically and socially, and that he was able to make good choices and attend to instruction when he was taking his medication. AT 207. Ms. James further observed that K.P. was pleasant and cooperative; that he appeared comfortable and confident as he answered questions and moved about; and, based upon an evaluation conducted by child psychiatrist Dr. Martin Irvin, that K.P. appeared able to handle himself better at home and at school. *Id.* Results of IQ testing conducted by Ms. James placed K.P. in the average range of intellectual ability. AT 208. Based upon her testing, Ms. James concluded that K.P.'s test scores reflected "solidly average . . . intellectual functioning" and that his academic achievement and progress in the classroom appeared "on level at this time". AT 209. Ms. James also discerned "[n]o significant behavioral issues" which, she noted, in the past had been prevalent. AT 209. Based upon her evaluation, Ms. James recommended that K.P. receive ninety minutes of consultant teacher support in the inclusive classroom, and that he continue attending speech therapy three times per

week, in addition to undergoing occupational and physical therapy.  *Id.*

On October 27, 2003 an Individualized Education Program ("IEP") was prepared for K.P. by officials in the Oswego City School District for the year 2003-2004.  AT 211-17.  In that IEP plaintiff was labeled as suffering from a disability identified as "other health impairment" and was recommended for receipt of consultant teacher services to assist in supporting social and emotional skills in the classroom setting, as well as occupational and speech/language therapy.  AT 211.  In formulating his IEP, school officials noted that K.P. was academically on par with his peers, although he showed significant delay in speech skills, language skills, motor skills, and social skills, all of which inhibited progress in the general education curriculum.  AT 212.  The IEP also noted that K.P. was capable of self-control despite being overly active and having a tendency to talk out of turn, AT 213, and that he needed work on developing postural control, visual tracking skills, fine motor skills, and bilateral skills, but recognized that he improved his ability to openly express his feelings. AT 214.

K.P. made noticeable academic and social improvement throughout the 2003-2004 school year.  By the end of the fourth academic quarter, classroom teacher Karen Reeser noted that K.P. had made good progress

in many areas, and was academically on level to enter second grade.  AT
259.  Although Ms. Reeser noted that K.P. was very capable of acting
appropriately when trying to do so, she also detected room for
improvement in the areas of respecting the diversity, rights, feelings, and
properties of others, as well as the manner in which he dealt with conflict.
*Id.*

On September 23, 2004, following a transfer to the Mexico Academy
and Central School District to attend second grade, K.P. was evaluated by
school psychologist Amy McDougall, M.S., to determine his educational
needs.  AT 249.  Ms. McDougall found K.P. to be friendly and easy going,
but observed that he had a high energy level and frequently needed to be
redirected back to task.  AT 250.  As illustrative of this conclusion, Ms.
McDougall noted that on one occasion during the examination, she had to
hold K.P.'s hand to prevent him from beginning the task before the
directions were read completely.  *Id.*  K.P. scored from "average to well
above average" on the individual achievement test, and was found to
possess "strong math skills, particularly in the area of problem solving."
*Id.*  K.P. was also found to display "good spelling skills", and was typically
able to self-correct his mistakes, with spelling and writing mistakes being
attributed to attentional concerns.  *Id.*

8

According to Ms. McDougall, K.P.'s second-grade teacher, Ms. Dashnau, described him as a "very active and highly distractible" child who required frequent redirection back to task.  *Id.*  Ms. Dashnau observed that K.P. often talked to others while they were working, worked ahead and did not know where the rest of the class was, and missed directions because he was out of his seat.  *Id.*  Ultimately, Ms. McDougall concluded that although he was an engaging boy who had made gains in several areas of difficulty, K.P. should continue to receive both indirect consultant teacher services and a shared assistant within the classroom in order to monitor the impact of his social, emotional, and behavioral needs on his academic progress, with occupational therapy to continue, although with discontinuation of speech/language services.  *Id.*

In October of 2004, Betsy Rice-Roberts, M.S., CCC-SLP/L, a speech-language pathologist, also evaluated K.P. to determine appropriate levels for his service and treatment.  AT 266.  In her report of that examination, Ms. Rice-Roberts noted that K.P. was often impulsive when responding to questions, causing him to give incorrect answers, but that he would self-correct after looking at all of the choices.  *Id.*  She also observed that K.P. experienced no difficulty with expressive or receptive tasks, and that his receptive, expressive, total language,

9

memory/processing, reasoning/critical thinking, and articulation scores all fell within the average range.  *Id.*  Based upon her evaluation, Ms. Rice-Roberts concluded that K.P. was not eligible to receive speech/language services.  AT 266-67.

On November 4, 2004 school officials at the Mexico Academy and Central School District generated a report benchmarking K.P.'s progress against the goals set forth in his IEP.  AT 277-81.  That report reflects that by that time K.P. had made some progress in several subcategories under the heading of social skills, and was progressing satisfactorily in several other areas including improvement in basic concepts and cognitive prerequisite skills as well as certain areas of socially acceptable behavior in the school environment.  *Id.*

During the administrative hearing conducted by the agency, K.P. testified regarding his schooling and typical daily activities.  K.P. stated that he is in the second grade at New Haven, and that he is enjoying it. AT 285.  He testified that he most enjoys math class, and that he dislikes gym because he does not like "running around too much."  *Id.*  K.P. noted that he likes his classroom teacher, and that he also finds his individual teacher nice to work with.  AT 286.  He also stated that he has both friends at New Haven and friends that do not go to his school.  AT 285-86.

K.P. testified that he enjoys playing football, and that he participates in football practices three times weekly and one game per week.  AT 299. K.P. additionally enjoys watching football on television, particularly games involving Syracuse University or the Green Bay Packers.  AT 287-88.  K.P. also likes hunting and nature, and can identify the foot tracks of different animals.  AT 298.

The plaintiff noted that her son's greatest strength is that he is very protective of other people, particularly children who are smaller than him. AT 291-92.  His protective nature has at times caused him to be involved in fights with other students.  AT 292.  K.P. is occasionally picked on at school because he receives one-on-one attention from a special education teacher.  AT 289-90, 292.  K.P.'s mother also testified that he is performing about the same in his courses as he was at the same time the previous year.  AT 294.  She added, however, that his behavior has deteriorated when compared to the previous year, a circumstance which she attributed to the fact that he had not yet become accustomed to the routine of his new school and lacked structure.  *Id.*  Ms. Lamay also noted that K.P. does well academically as long as he has one-on-one attention from teachers, AT 295, and gets along with most people in his house, although he occasionally fights with his younger brother, AT 297.

11

B.    Medical Records

According to the record, K.P. has been seen by Shashikant Bhopale, M.D., on various occasions between September of 2001 and August of 2004, primarily for routine yearly examinations; maintenance of ADHD and asthma medications; and treatment for moderate congestion, upper respiratory infection, headaches, sinusitis, and possible allergic rhinitis. AT 228-45.  K.P. was initially prescribed Adderall for his ADHD, although he later switched to Strattera toward the end of 2003.  AT 233.  K.P.  has also taken Singulair for treatment of his asthma.  AT 233-34.  Over the course of the treatment relationship, Dr. Bhopale noted that K.P. was doing well both in school, and on his ADHD medication.  AT 238-41, 243.

On March 17, 2003, Samuel Balderman, M.D., performed a consultative pediatric examination of K.P.  *See* AT 184-87.  Dr. Balderman observed that K.P.'s behavior "seemed appropriate" during the examination.  AT 187.  Dr. Balderman's report of that examination reflects that it was largely unremarkable, with vital signs, general appearance, and physical condition all falling within the normal range for his age.  AT 185-87.  Dr. Balderman also noted that K.P.'s speech and behavior were normal for his age, although his attention span was "slightly diminished." AT 185.  Dr. Balderman concluded that K.P. should continue treatment

12

with his mental health specialist.  AT 187.

On that same date, a consultative speech and language evaluation was performed by Christine Windheim, M.S., CCC-SLP.  AT 180.  Based upon her examination, Ms. Windheim determined that K.P. had age-appropriate vocal quality and fluency skills, and normal receptive and expressive language skills, but that he displayed moderate-to-severe articulation delays.  AT 182.  Ms. Windheim noted that K.P. demonstrated "significant impairment" with his speech articulation skills, and recorded her prognosis as "good with continued appropriate intervention."  *Id.*

K.P. was referred to F. Javier Monreal, M.D., on October 27, 2004 for a neurological consultation to address his ongoing headaches.  AT 248.  Dr. Monreal found that K.P. was fairly well behaved during the examination, and was able to concentrate on assigned tasks.  *Id.*  Dr. Monreal noted that K.P. was able to squeeze fifty pounds with each hand, and did well tossing and catching a ball.  *Id.*  K.P. could also stand on his heels and toes, and walk a straight line.  *Id.*  It was noted that K.P. had been getting headaches since the age of three and, most recently, had suffered from as many as one headache per week.  *Id.*  Dr. Monreal prescribed Periactin for K.P.'s headaches and recommended that Ms. Lamay keep track of the headaches on a calendar.  *Id.*  Dr. Monreal also

13

requested that Ms. Lamay keep him apprised as to K.P.'s progress.  *Id.*

K.P. was examined by Dr. Randall, a State agency physician, on April 15, 2003 for a combination of his moderate-to-severe articulation delay, ADHD, and asthma.  AT 188-93.  From his examination, Dr. Randall concluded that there was a less-than-marked limitation in K.P.'s ability to acquire and use information, attend to and complete tasks, interact and relate with others, and care for himself, as well as in his health and physical well-being, due to his asthma, AT 190-91; that K.P. experienced no limitation in his ability to move and manipulate objects, *id.*; and that K.P. did not display a marked limitation in any of the six relevant domain evaluations.  AT 190-91.  Dr. Randall concluded that the impairment or combination of impairments was severe, but did not meet, medically equal, or functionally equal any listed, presumptively disabling impairment.  AT 188.

During the hearing held by the agency, K.P. and his mother testified regarding his medical history and various medications taken by him. K.P.'s mother noted that his therapist has suggested getting him involved in activities for his hand and eye coordination.  AT 287.  According to his mother, K.P. is often harassed by other students at school when leaving class to get his medicine.  AT 290.  K.P. has been taking twenty-five

14

milligrams of Straterra in the morning before school.  *Id.*  Dr. Bhople has

considered increasing K.P.'s dosage, but decided to first give him a

chance to adapt to his new school, schedule, and routine.  AT 290-91.

K.P. also takes five milligrams of Singulair at night for treatment of asthma,

AT 298, and uses an albuterol nebulizer and an inhaler as needed.  *Id.*

Ms. Lamay testified that K.P.'s asthma is a secondary disability to his

ADHD.  AT 300.  His mother also testified that when he gets nervous or

scared, K.P. becomes quiet and can "sit forever."  AT 295.  She also

stated that K.P. has suffered from "frequent headaches" since he was a

little boy, often culminating in trips to the hospital, AT 301, and noted that

the headaches have been treated with ibuprofen and Imitrex.  *Id.*

II.    PROCEDURAL HISTORY

    A.    Proceedings Before The Agency

    On January 24, 2003 plaintiff filed a claim for SSI benefits on K.P.'s

behalf, asserting a protective filing date of January 6, 2003.  AT 46-49.

Following the denial of that application at the initial level, AT 28-32, a

hearing was conducted at plaintiff's request on September 27, 2004

before ALJ Mark Newburger.  AT 33-34; *see also* AT 281-309.  During that

hearing, at which plaintiff appeared *pro se*, testimony was elicited from

both K.P. and his mother, Ms. Lamay.  *See id.*

Following the hearing, ALJ Newburger issued a decision dated January 5, 2005, finding that K.P. was not disabled and, accordingly, denying plaintiff's application on his behalf for SSI benefits.  AT 13-27. Engaging in a *de novo* review of the evidence before the agency in his decision, the ALJ applied the governing three-step test for determining childhood disability.  *Id.*  After finding that K.P. had not engaged in substantial gainful activity since the alleged January 6, 2003 onset of his disability, AT 26, the ALJ next found that he suffers from severe impairments which, in combination, cause more than minimal restrictions upon his ability to function and have lasted or are expected to last at least twelve months, including ADHD; developmental delays in the areas of speech, language, and motor skills; asthma; and allergies.  AT 26.  The ALJ went on to conclude, however, that K.P.'s medically determinable impairments do not meet or medically equal in severity any of the conditions set forth in the listing of presumptively disabling impairments set forth in the regulations, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 27.

Proceeding to the third step, entailing a determination of functional equivalency, the ALJ addressed the six focal areas in the functional equivalency calculus.  AT 24-26.  Based upon the record before him, the

16

ALJ found no extreme or marked limitation in any of the six relevant domains.  AT 24-27.  ALJ Newburger therefore concluded that K.P. was not disabled and, accordingly, ruled him ineligible for SSI benefits.  AT 27.  The ALJ's opinion became the final determination of the Commissioner on May 5, 2005, when the Social Security Administration Appeals Council denied plaintiff's request for review of the decision.  AT 3-5.

B.    This Action

Plaintiff commenced this action on July 7, 2005.  Dkt. No. 1.  Issue was thereafter joined by the Commissioner's filing of an answer, accompanied by an administrative transcript of the proceedings before the agency, on November 18, 2005.  Dkt. No. 5.  With the filing of the plaintiff's brief on February 2, 2006, Dkt. No. 9, and a brief on behalf of the Commissioner on April 20, 2006, Dkt. No. 12, the matter is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(d).[4]  *See also* Fed. R. Civ. P. 72(b).

---

[4]     This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998 and was subsequently amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings has been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

III.   DISCUSSION

A.   Scope Of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir. 1987)).   Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148.  If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

18

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S. Ct. 206, 216-17 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record. *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427; *Martone*, 70 F. Supp. 2d at 148 (quoting *Richardson*).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of

42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to
develop a full and fair record or to explain his or her reasoning.  *Martone*,
70 F. Supp. 2d at 148 (citing *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.
1980)).  A remand pursuant to sentence six of section 405(g) is warranted
if new, non-cumulative evidence proffered to the district court should be
considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and
Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without
remand, while unusual, is appropriate when there is "persuasive proof of
disability" in the record and it would serve no useful purpose to remand
the matter for further proceedings before the agency.  *Parker*, 626 F.2d at
235; *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir.
1992); *Carroll v. Sec'y of Health and Human Servs.,* 705 F.2d 638, 644
(2d Cir. 1983).

> B.   Childhood Disability Determination:  The Three-Step
>      Evaluation Process

In 1996 Congress significantly altered the childhood disability terrain
for purposes of eligibility for SSI benefits under the Social Security Act by
enacting the Personal Responsibility and Work Opportunity Reconciliation
Act of 1996 ("PRWORA").  Pub. L. No. 104-193, 110 Stat. 2105 (1996).[5]

---

[5]   Entitlement to SSI benefits is governed by a federal program intended to
provide benefits to needy aged, blind, or disabled individuals who meet certain

In accordance with the PRWORA, which took effect on August 22, 1996,

an individual under the age of eighteen is disabled, and thus eligible for

SSI benefits, if he or she

> has a medically determinable physical or mental
> impairment, which results in marked and severe
> functional limitations, and which can be expected
> to result in death or which has lasted or can be
> expected to last for a continuous period of not less
> than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i).  That definitional provision goes on to

exclude from coverage any "individual under the age of [eighteen] who

engages in substantial gainful activity. . . ."  42 U.S.C. § 1382c(a)(3)(C)(ii).

By regulation, the agency has prescribed a three-step evaluative

process to be employed in determining whether a child can meet the

statutory definition of disability.  20 C.F.R. § 416.924; *Kittles v. Barnhart,*

245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*,

02Civ.3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003).  The first

step of the test, which bears some similarity to the familiar five-step

analysis employed in adult disability cases, requires a determination of

whether the child has engaged in substantial gainful activity.  20 C.F.R. §

416.924(b); *Kittles,* 245 F. Supp. 2d at 488.  If so, then both statutorily and

---

statutory income and resource limitations.  42 U.S.C. § 1381; *see Schweiker v. Wilson*, 450 U.S. 221, 223, 101 S. Ct. 1074, 1077 (1981).

by regulation the child is ineligible for SSI benefits.  42 U.S.C. §

1382c(a)(3)(c)(ii); 20 C.F.R. § 416.924(b).

 If the claimant has not engaged in substantial gainful activity, the

second step requires examination of whether the child suffers from one or

more medically determinable impairments that, either singly or in

combination, are severe – that is, that which causes more than a minimal

functional limitation.  20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at

488; *Ramos*, 2003 WL 21032012, at *7.  If the existence of a severe

impairment is discerned, the agency must next determine whether it meets

or equals a presumptively disabling condition identified in the listing of

impairments set forth under 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the

"listings").  *Id.*  Equivalence to a listing can be either medical or functional.

20 C.F.R. § 416.924(d); *Kittles,* 245 F. Supp. 2d at 488; *Ramos*, 2003 WL

21032012, at *7.  If an impairment is found to meet, or qualify as medically

or functionally equivalent to, a listed disability and the twelve-month

durational requirement is satisfied, the claimant will be deemed disabled.

20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

 Under final regulations which became effective on January 2, 2001,

and materially altered the test dictated under the superceded interim rules,

*see, e.g., Kittles*, 245 F. Supp. 2d at 488-89, analysis of functionality is

22

informed by consideration of how a claimant functions in six main areas denominated as "domains."  20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8.  The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do."  20 C.F.R. § 416.926a(b)(1).  Those prescribed domains include

> (i)     [a]cquiring and using information;
> (ii)    [a]ttending and completing tasks;
> (iii)   [i]nteracting and relating with others;
> (iv)   [m]oving about and manipulating objects;
> (v)    [c]aring for [oneself]; and
> (vii)   [h]ealth and physical well-being.

20 C.F.R. § 416.926a(b)(1).  A finding of disability is warranted if a "marked" limitation is found in any two of the listed domains.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.  A "marked limitation" exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  Functional equivalence is obtained in the event of a finding of an "extreme" limitation, meaning "more than marked," in a single domain.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.  An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

C.    The Evidence In This Case

In her challenge to the ALJ's decision, plaintiff contends that the ALJ

erred in instructing her concerning the right to the assistance of counsel in

connection with the administrative hearing process, and that the error was

compounded by the ALJ's failure to fully develop the record.  Plaintiff also

maintains that the ALJ erred when he found that K.P.'s ADHD was not of

sufficient severity to meet or equal Listing 112.11.  Lastly, plaintiff argues

that the ALJ's assessment of the credibility of her testimony regarding

K.P.'s limitations did not comply with SSR 96-7p and 20 C.F.R. §

404.1529.

1.    Voluntary and Knowing Waiver of the Right To Counsel
and Development of the Record

(i)    Voluntary and Knowing Waiver of the Right to
Counsel

While the Commissioner is under no obligation to provide claimants

with gratuitous legal representation during administrative proceedings

before the agency, a claimant is entitled to be represented by counsel at a

hearing before an agency ALJ.  20 C.F.R. §§ 404.1700, 404.1705.  An

ALJ conducting such a hearing is therefore under an obligation to convey

to an uncounselled claimant, in advance of the hearing, information

regarding the right to have legal representation and the availability and

identity of organizations that will provide free legal services in such a setting.  20 C.F.R. § 404.916; *Infante v. Apfel*, No. 97 Civ. 7689, 2001 WL 536930, at *9 (S.D.N.Y. May 21, 2001); *Santiago v. Apfel*, No. 98 Civ. 9042, 2000 WL 488467, at *5 (S.D.N.Y. Apr. 25, 2000); *Alvarez v. Brown*, 704 F. Supp. 49, 52 (S.D.N.Y. 1989); *see also Gold v. Sec'y of Health, Educ. and Welfare*, 463 F.2d 38, 43 (2d Cir. 1972) (suggesting that ALJs actively advise *pro se* claimants to obtain legal assistance).

The Act created a "statutory right to notice of the options for obtaining legal representation . . . ." *Frank v. Chater*, 924 F. Supp. 416, 422 (E.D.N.Y. 1996) (emphasis omitted).  The "right to representation," in such proceedings, however, merely guaranties the right to choose to have representation at the hearing.  *Mallet v. Barnhart*, No. 01 CV 2337, 2002 WL 32096587, at *5 (E.D.N.Y. Sept. 1, 2002); *Frank*, 924 F. Supp. at 422. Once a claimant is provided with adequate notification of that right, he or she may waive the option to proceed with counsel, either in writing or before the ALJ.  *Frank*, 924 F.2d at 423.

The record shows that plaintiff received written notification of her right to be represented by counsel at the hearing on three separate occasions.  The first such notification was contained in a Notice of Disapproved Claims form dated April 22, 2003, which explained that the

25

plaintiff could have a "lawyer . . . help [her]" and that there were groups available to assist plaintiff in finding a lawyer or offer her "free legal services."  AT 31.  The second notification was included within the Request for Hearing By Administrative Law Judge form, which advised that the plaintiff had a "right to be represented at the hearing" and that her Social Security office would give her a list of "legal referral and service organizations."  AT 33.  The plaintiff received a third notification of her right of representation in the Notice of Hearing form dated August 23, 2004, notifying her of the right to have a person represent her at the hearing.[6]  AT 39.

At the outset of the hearing, the ALJ verbally reenforced these written reminders of the right to be represented, stating:  "I do need to inform you that you do have the right to legal counsel."  AT 283.  The ALJ further advised that "[i]f you wanted a lawyer and wanted to have a postponement of today's hearing, I would allow you to have such a postponement."  AT 283.  Clearly, these statements qualify as providing a clear and adequate in-person notification of the plaintiff's right to counsel during the administrative hearing, and of the ALJ's willingness to postpone

_____

[6]     The plaintiff acknowledged receiving this notice by signing the acknowledgment form on August 28, 2004.  AT 43.

26

the hearing necessary to afford the plaintiff an opportunity to retain

counsel, and were therefore plainly sufficient to pass muster under the

guidelines promulgated pursuant to the Act.

After the ALJ outlined the claimant's right to representation and

explained that she was not required to obtain a lawyer, the teleconference

device being utilized developed technical difficulties.  In light of the

problems encountered, the ALJ, for a second time, explained that the

plaintiff could get a "postponement of the hearing [to] get a lawyer."  AT

284.  The plaintiff nonetheless expressed her desire to proceed with the

hearing, stating "[g]o forward, please, Judge."  *Id.*  For a third time, the

ALJ asked whether the plaintiff desired to "go forward" with the hearing.

*Id.*  The plaintiff again consented to proceed with the hearing by

responding, "[p]lease [go forward]."  *Id.*  Based upon that colloquy, the ALJ

found that the "[plaintiff] ha[d] waived her right to counsel," and thus

continued with the hearing.

Having reviewed the entire record of the proceedings before the

agency, and in particular the three written notices provided to the claimant

of her right to counsel, the verbal reiteration of that right by the ALJ, and

plaintiff's oral waiver of her right to counsel during the hearing, I conclude

that her decision to proceed with the hearing without the benefit of legal

representation constituted a knowing and voluntary waiver of her right to legal representation.  I further conclude that the technical difficulties reflected in the hearing transcript and cited by the plaintiff in support of her argument do not warrant a contrary result in light of the fact that plaintiff twice stated that she wished to proceed with the hearing.

I note that in support of her argument regarding legal counsel plaintiff asserts that courts within the Second Circuit should apply more exacting parameters for the contents of notification than those mandated by the Act, as found by one court to be warranted, including "(1) an explanation of the benefits of having an attorney to aid in the proceeding; (2) notification of the possibility of seeking free counsel or a contingency arrangement; and (3) notification regarding the statutory twenty-five percent withholding limitation on attorney's fees in cases brought under Title II as provided in 42 U.S.C. § 406(a) as well as the fee approval process generally." *Frank*, 924 F. Supp. at 422 (citations omitted).  While in *Frank* the Eastern District adopted these specific requirements, which extend beyond those imposed by the Act and accompanying regulations, the Northern District has not followed course.  *See also Gonzales v. Barnhart*, No. 02 Civ. 5813, 2003 WL 22383376, at *5 (S.D.N.Y. Oct. 16, 2003); *Infante*, 2001 WL 536930, at *10 n.8 (Southern District stating that

28

it is "aware of only one other case in the Eastern District of New York that

adopted *Frank* . . . and no similar decision in the Southern District of New

York, not to mention the Court of Appeals for the Second Circuit.").  I am

aware of no Northern District or Second Circuit precedent suggesting that

the exacting requirements of *Frank* have become the law of this Circuit.

Undeniably, an ALJ must ensure that if a claimant chooses to

proceed *pro se*, his or her waiver of the right to representation is knowing

and voluntary.  *Taveras v. Apfel*, No. 97 Civ. 5369, 1998 WL 557587, at *3

(S.D.N.Y. Sept. 2, 1998).  The Second Circuit has recognized the benefits

of having counsel available to assist in developing the record,

consequently imposing a higher duty on the ALJ when the claimant

proceeds *pro se*.  *See Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990).

This heightened duty applies even where the claimant is "nominally

represented" by, for example, a family member, friend, or social worker.

*Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir.

1982).  This elevated standard was met in this case.  In permitting the

plaintiff to proceed *pro se*, the ALJ considered the entire record.  The

plaintiff was notified in writing on three separate occasions of her right to

obtain representation for the hearing.  Further, she waiver her right to

counsel twice at the beginning of the hearing.  The ALJ thus satisfied his

obligation to notify the *pro se* plaintiff of her right to representation, and to assure that her waiver of that right was knowing and intelligent.

(ii)   <u>Development of the Record</u>

Plaintiff further claims that the ALJ failed to meet his duty to fully develop the record – a duty which takes on increased significance in cases involving unrepresented claimants.  "Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits and the Council's review is similarly broad."  *Sims v. Apfel*, 530 U.S. 103, 110-11, 120 S. Ct. 2080, 2085-86 (2000) (citing *Richardson*, 402 U.S. at 400-01, 91 S. Ct. at 1426-27); *see also Cruz*, 912 F.2d at 12. Determination of whether plaintiff was prejudiced by the absence of representation is "bound up in the inquiry of whether the ALJ properly conducted the hearing and adequately developed the record."  *Alvarez v. Brown*, 704 F. Supp. 49, 53 (S.D.N.Y. 1989) (citing *Robinson v. Sec'y of Health & Human Servs.*, 733 F.2d 255, 258 (2d Cir. 1984)).  When a claimant appears *pro se*, the ALJ has a "'duty . . . to scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts. . . .'" on behalf of the claimant.  *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Gold*, 463 F.2d at 43); *see also Cotis v. Massanari*, No.

30

00 Civ. 4693, 2001 WL 527471, at *4 (S.D.N.Y. May 17, 2001); *Robinson*, 733 F.2d at 258; *Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975).  Where the claimant was "'handicapped by lack of counsel'" at the hearing, the reviewing court has a duty to make a "'searching investigation'" of the record to ensure that the claimant's rights were protected.  *Hankerson*, 636 F.2d at 895 (quoting *Gold*, 463 F.2d at 43).

In this instance, it is apparent that the ALJ fully developed the record, both before and during the relevant disability period.  The ALJ obtained all available medical records regarding K.P., including records from Dr. Bhopale and Dr. Monreal.  AT 77-78, 90, 93, 153, 172-79, 203, 228-245, 248.  While the ALJ also afforded the plaintiff the opportunity to obtain pertinent records from Dr. Gabriel, AT 306-307; *see* AT 77, 90, 94, 153, the plaintiff declined that invitation and indicated that those records were not necessary to his determination.  AT 307.

In addition to obtaining relevant medical records, the agency referred K.P. for a pediatric examination and a consultative speech-language evaluation, AT 180-87, and a state agency physician reviewed K.P.'s record and provided a medical opinion.  AT 188-93.  The agency also obtained all of K.P.'s relevant school records, which in this case were extensive and covered four school years during which he attended school

in several different districts.  AT 95-152, 156-71, 206-27, 246-47, 249-80.

The educational records secured included indications of academic

performance, teacher evaluations, and psychological evaluations.  It

should also be noted that the ALJ left the record open after the hearing so

that plaintiff could submit an upcoming IEP and report card.  AT 307.

The record also reflects that the ALJ conducted a thorough hearing.

AT 283-309.  During the hearing, the ALJ discussed K.P.'s medical

history, school performance, treatment, medication, after-school activities,

family relationships, and friend relationships.  AT 284-309.  The ALJ also

asked the plaintiff whether there was anything she wanted to add to the

record to ensure that it was complete.  AT 302.  The hearing record covers

twenty-six pages, and is fully developed.  *Contrast Cruz*, 912 F.2d at 11

("[Thirteen-page transcript] reveals a host of lost opportunities to explore

the facts."); *Rodriguez v. Callahan*, 971 F. Supp. 150, 153-54 (S.D.N.Y.

1997) (seven-page transcript not fully developed).

Under these circumstances, I find no failure on the part of the ALJ to

properly and fully develop the record in this case.

2.    Severity Of K.P.'s ADHD

Plaintiff next alleges that K.P.'s ADHD is of sufficient severity to

meet or equal Listing 112.11, and that the ALJ erred when he failed to

contact a treating or examining source to elicit an opinion on the issue.

Dkt. No. 9.

By regulation, the Commissioner has set forth a series of listed

impairments describing a variety of physical and mental conditions,

indexed according to the body system affected.[7]  20 C.F.R. Pt. 404, Subpt.

P, App. 1; *see Sullivan v. Zebley*, 493 U.S. 521, 529-30, 110 S. Ct. 885,

890-91 (1990).  The version of Listing 112.11 in effect at the relevant time,

relating to ADHD, addressed "developmentally inappropriate degrees of

inattention, impulsiveness, and hyperactivity."  20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 112.11.  The required level of severity for that disorder is met

when the requirements of both A and B are satisfied, as follows:

> A.  Medically documented findings of all three of the following:
> 1.  Marked inattention; and
> 2.  Marked impulsiveness; and
> 3.  Marked hyperactivity.
>
> And
>
> B. . . . for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in B2 of 112.02.

_____

[7]     The listings are broken down into fifteen categories, including growth impairment, musculoskeletal system, special senses and speech, respiratory system, cardiovascular system, digestive system, genitourinary impairments, hematological disorders, skin disorders, endocrine system, impairments that affect multiple body systems, neurological, mental disorders, malignant neoplastic diseases, and immune system.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §112.11.

As can be seen, to qualify under Listing 112.11 a plaintiff must establish not only that there is a medically documented finding of marked inattention, marked impulsiveness, and marked hyperactivity, but additionally that he or she can satisfy at least two of the listed age-appropriate criteria.  As a threshold matter, the record in this case fails to reflect a marked limitation of the three criteria listed under A.

A "marked limitation" is defined as when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  To be sure, there is evidence in the record that suggests that K.P. has experienced difficulties in his day-to-day functioning.  K.P.'s kindergarten report card indicated that he had "much difficulty paying attention" and that he was "constantly moving and [could not] stay seated."  AT 118.  The report card further stated that he acted impulsively and needed "frequent reminders to stay focused."  *Id.*  His kindergarten and second-grade teachers noted that he was "very active and highly distractable," and he often needed "redirection back to task."  AT 97, 250.  K.P.'s kindergarten teacher also found him to be "very impulsive" at times.  AT 167.

By the 2003-2004 school year, however, and at times relevant to this

34

appeal, K.P. had made significant gains in these areas.  When K.P.

reached the first grade, he had "solidly average intellectual functioning"

and his progress within the classroom was on grade level.  AT 209.

Further, the psychological evaluation noted that he displayed "[n]o

significant behavioral issues."  *Id.*  He was able to make good choices and

attend to instruction when he was taking his medication.  AT 207.  He was

also easily directed by his teachers, was capable of self-control, and was

described as a "friendly youngster."  *Id.*; AT 213-14.

　　　During the 2004-2005 school year, speech and language services

were discontinued following a speech-language assessment in light of

K.P.'s significant progress in the area and the conclusion that his

language skills were within the average range.  AT 250, 267.  Moreover,

his individual achievement testing showed that he performed average to

well-above average when compared with his peers.  AT 250, 272.

Although it was found that K.P. needed to work on staying focused, AT

272, he was also determined to be progressing satisfactorily or making

some progress in his social skills and understanding of basic concepts

and cognitive perquisite skills.  AT 278, 280.

　　　The ALJ's conclusion that K.P. did not suffer from marked

inattention, marked impulsiveness, and marked hyperactivity is amply

supported by substantial evidence.  The ALJ found the record to be

lacking in objective medical evidence to satisfy the specific criteria of the

listings, and no treating or examining physician has made findings

equivalent to the criteria of Listing 112.11.  Because it was based upon a

thorough evaluation of the entire record, including school records, medical

records, family history, and witness testimony, the ALJ's conclusion that

K.P.'s condition did not meet or equal in severity the conditions referenced

in Listing 112.11 is supported by substantial evidence.

### 3.    Evaluation Of Plaintiff's Credibility

In support of his challenge of the denial of benefits, plaintiff also

maintains that the ALJ improperly rejected her testimony concerning the

debilitating effects of K.P.'s condition.  The precise contours of this

argument, however, are somewhat vague.  In his decision, the ALJ notes

his finding that plaintiff's subjective testimony regarding her son's

limitations was "not fully credible," though unfortunately without

elaboration.  AT 23, 27.  Plaintiff's brief does nothing to provide

illumination regarding this argument, in that it does not cite to specific

portions of her testimony which are inconsistent with the ALJ's finding and

were by definition rejected in order to arrive at the conclusion of no

disability.

It is well within the discretion of the Commissioner to evaluate the credibility of a plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence. *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984); SSR 97-7p, 1996 WL 374186 (S.S.A.). "Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," all information submitted by a claimant concerning his or her symptoms must be considered. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The claimant's testimony alone carries independent weight; to require a claimant to fully substantiate his or her symptoms with "medical evidence would be both in abrogation of the regulations and against their stated purpose." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 207 (W.D.N.Y. 2005) (citing *Castillo v. Apfel*, No. 98 CIV. 0792, 1999 WL 147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

The regulations proscribe a specific process that the ALJ is to follow in weighing a claimant's testimony. The ALJ must first establish that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(b). If the ALJ finds such an impairment, the ALJ next evaluates the intensity and persistence of the symptoms to determine how the symptoms limit the

37

claimant's functioning.  *Id.* § 416.929(c).

A claimant's testimony is entitled to considerable weight when it is consistent with and supported by objective clinical evidence demonstrating that the claimant has a medical impairment which one could reasonably anticipate would produce such symptoms.  *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).  If the claimant's testimony concerning the intensity, persistence, or functional limitations is not fully supported by clinical evidence, the ALJ must consider additional factors, including: (1) daily activities; (2) location, duration, frequency, and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medications taken to relieve symptoms; (5) other treatment received; and (6) any other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject a claimant's subjective testimony.  *Martone,* 70 F. Supp. 2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  Although the ALJ is free to accept or reject such testimony, a "finding that the

witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams*, 859 F.2d at 260-61 (citation omitted).  Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony may not be disturbed on court review.  42 U.S.C. §405(g); *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).

Plaintiff argues that the ALJ did not as a threshold matter determine whether an underlying impairment exists which could cause the claimant's symptoms.  Although he does not provide significant elaboration, it appears certain that in the portion of the decision addressing credibility, the ALJ did not find that there were underlying impairments which could have caused K.P.'s claimed symptomology.  *See* AT 23.  After considering the entire medical record before him, the ALJ also concluded that K.P. "does not have an impairment or impairments that result in inability to perform fine and gross movements effectively," asthma attacks of the frequency and intensity to equal the value in the listing, or a marked impairment in at least two of the main categories.  AT 15.

The ALJ found that while K.P. has "areas of difficulty" in asthma, speech expression, and hyperactivity, he is on par academically with his

classmates and has "done well on medication for ADHD."  AT 15-16.  The

ALJ first considered whether K.P. has suffered from asthma attacks and

related symptoms of the frequency or intensity described in the listings.

*Id.*; AT 17.   He found that although K.P. went to the hospital "a number of

times" from September of 2001 to August of 2004, he "did well with

Singulair and Albuterol," that there was no wheezing reported, and that

there was no indication in the record of pulmonary hyperflation or

peribronchial disease.  AT 15-18.

The ALJ also noted that, while K.P. has had articulation delays and

speech therapy in the past, his first and second grade report indicated that

he had been progressing toward the standard and meeting the standard.

*Id.*; AT 21.  In fact, speech therapy services are no longer needed, and

K.P.'s most recent report showed that he was performing well.  AT 16.

Finally, the ALJ found that K.P. has had difficulties with behavior, focus,

inattention, impulsiveness, hyperactivity, social skills and concentration,

but that the problems in those areas are not to a marked degree.  *Id.*; AT

19, 20, 21, 22.

The ALJ's determination that the plaintiff's subjective allegations

regarding her son's condition are "not fully credible as the documentary

evidence of record [and] . . . does not show an impairment or impairments

likely to produce symptoms of the severity asserted" is supported by

substantial evidence and was explained sufficiently in the ALJ's

uncharacteristically lengthy decision to satisfy the first step of the two-step

process under SSR 96-7p.  AT 23, 27.  In rendering his decision the ALJ

considered the entire record, including K.P.'s school records, medical

records, and testimony at the hearing.  The decision reflects the ALJ's

finding that while K.P. does, or at one point did, experience an underlying

medically determinable physical or mental impairment including asthma,

speech expression, and hyperactivity, it could not reasonably be expected

to produce the severity of the individual's limitations consistent with

plaintiff's testimony.  *See*, *e.g.*, *Brown v. Callahan*, 120 F.3d 1133, 1135-

36 (10th Cir. 1997) (rejecting testimony of parent regarding impairments of

child as not credible where medical evidence did not coincide with that

testimony).

The fact that the ALJ concluded that while underlying impairments

existed, they were not of the severity required to give rise to the claimed

symptoms is further supported by the fact that the ALJ considered the

intensity, persistence, and limiting effects of K.P.'s ability to engage in

basic activities.  This analysis is in compliance with the second step of the

two-step process for evaluating symptoms under SSR 96-7p.   The ALJ

plainly drew upon the entire case record in formulating his conclusion

concerning the credibility of the plaintiff's statements regarding her son.

While ideally, the ALJ should have more clearly laid out his reasoning,

employing as a framework the prescribed two-step test, this error did not

prejudice the plaintiff since the ALJ's analysis was otherwise full and

proper.

VI.    SUMMARY AND RECOMMENDATION

        The record in this case firmly establishes that in arriving at his

conclusion the ALJ applied proper legal principles, and his resulting

determination is supported by substantial evidence in the record.

Addressing specifics of plaintiff's arguments, the record reveals that she

was notified on many occasions of her right to be represented by counsel,

and that she knowingly and voluntarily waived that right and chose instead

to go forward with the hearing process.  Plaintiff's argument that in light of

her *pro se* status the ALJ was under heightened obligation to fully develop

the record but failed to do so is equally unavailing, in light of the fact that

the record reveals extensive measures on the part of the ALJ and the

agency to acquire the records and information necessary to determine the issue of disability.  Turning to the question of listings, the record firmly establishes that K.P.'s ADHD is not of sufficient severity to meet or equal Listing 112.11.  Finally, to the extent that her testimony may marginally have been in conflict with the finding of no disability, the ALJ's rejection of plaintiff's subjective testimony was proper and sufficiently explained, particularly in view of the ALJ's extensive discussion of the record and plaintiff's disability.  Accordingly, it is hereby

RECOMMENDED that the defendant's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability AFFIRMED, and plaintiff's complaint DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of Court within ten (10) days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1) (2006); Fed. R. Civ. P. 6(a), 6(e), 72; *Roland v. Racette*, 984 F.2d 85 (2d Cir. 1993).

IT IS FURTHER ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with

this court's local rules.

Dated:      July 31, 2007
            Syracuse, NY


                                    David E. Peebles
                                    U.S. Magistrate Judge